# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

DEREK C. SMITH,

                Petitioner,

v.                                  Case No. 3:22-cv-1042-TJC-MCR

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

                Respondents.

_____

## ORDER

## I.   Status

Petitioner, an inmate of the Florida penal system, initiated this action by filing a pro se Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (Doc. 1) on September 16, 2022 (mailbox rule). He challenges a 2018 state court (Duval County, Florida) judgment of conviction for armed robbery and armed burglary. Petitioner is serving a term of life imprisonment as a Prison Releasee Reoffender. Respondents filed a Response (Doc. 10), with exhibits (Docs. 10-1 to 10-21[1]), arguing that this case should be

---

[1] For all documents filed in this case, the Court cites to the document and page numbers as assigned by the Court's electronic case filing system.

dismissed with prejudice as untimely filed, or alternatively, denied on the merits. Petitioner filed a Reply (Doc. 13).

Upon due consideration, the Court finds this case is due to be dismissed with prejudice. The Court first addresses the timeliness issue followed by a discussion of the merits.[2]

## II.    <u>One-Year Limitations Period Discussion</u>

### a. Governing Legal Authority

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) amended 28 U.S.C. § 2244 by adding the following subsection:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
>
>> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

---

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." <u>Jones v. Sec'y, Fla. Dep't of Corr.</u>, 834 F.3d 1299, 1318 (11th Cir. 2016) (citing <u>Chavez v. Sec'y Fla. Dep't of Corr.</u>, 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." <u>Id.</u> The Court finds that "further factual development" is unnecessary. <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

### b. Relevant Procedural History

On June 28, 2018, following a jury trial, Petitioner was adjudicated guilty of armed robbery and armed burglary. See Doc. 10-2 at 210-17. The trial court sentenced him to concurrent terms of life imprisonment. See id. at 213-15. Petitioner, through counsel, filed a direct appeal. Id. at 253. On December 31, 2019, the First District Court of Appeal issued a written opinion affirming in

part and reversing and remanding in part, with instructions that the trial court reconsider Petitioner's motion for a new trial under the correct standard. See Doc. 10-11. On remand, the trial court entered an order on January 29, 2020, denying the motion for a new trial (Doc. 10-12 at 2), and entered a "NEW" written judgment and sentence—identical to the first judgment and sentence— on February 6, 2020, nunc pro tunc to June 28, 2018 (id. at 3-10).[3] Petitioner did not appeal the trial court's January 29, 2020 order denying his motion for a new trial.

On May 20, 2020 (mailbox rule), Petitioner filed a motion to clarify his sentence. See Doc. 10-13. On June 4, 2020, the trial court construed the motion as being filed pursuant to Florida Rule of Criminal Procedure 3.800(a) and summarily denied the motion. See Doc. 10-14. Petitioner did not appeal.

In September 2020, Petitioner filed two notices of inquiry with the trial court. First, on September 4, 2020 (mailbox rule), Petitioner filed a "Notice of Inquiry," asking whether the trial court had issued a ruling following the First DCA's December 31, 2019 remand. See Doc. 10-15. He advised: "I have not

---

[3] It appears the trial court took the first seven pages of the original 2018 judgment and on the first page wrote: "NEW" judgment and "Re-record to reflect new judgment per 1st DCA mandate dated 1/21/20." Doc. 10-12 at 3. Then on the last page, the judge signed the judgment and dated it February 6, 2020, nunc pro tunc to June 28, 2018. Id. at 10. To add another date into the mix, the first page of the "NEW" judgment contains a filed stamp from the clerk's office dated January 29, 2020. Id. at 3. The Court uses the judge's signature date (February 6, 2020) when describing this document.

rec[ei]ved any paperwork, notice, ruling e[tc]. up to this date and I am confused as to if this issue has been accident[all]y overlooked, is still pending for a ruling, or if [I']m waiting for a transport order so I can be present for the ruling on my motion for new trial." Id. at 2. Second, on September 23, 2020 (mailbox rule), Petitioner filed another "Notice of Inquiry," requesting "the status of [his] appeal that was reversed by the District Court of Appeal in case number 1D18-3208." Doc. 10-16.

On May 20, 2021 (mailbox rule), Petitioner filed a pro se motion pursuant to Florida Rule of Criminal Procedure 3.850. See Doc. 10-17 at 5-19. The trial court summarily denied the motion on June 30, 2021.[4] See id. at 20-260; Doc. 10-18 at 2-246. Petitioner appealed, and the First DCA per curiam affirmed the denial of his Rule 3.850 motion without issuing a written opinion. See Doc. 10-21 at 2-3. The mandate issued on April 26, 2022. See id. at 4.

Petitioner filed the instant case on September 16, 2022.

### c. Timeliness Analysis

This Court must first determine whether Petitioner's February 6, 2020 "NEW" judgment and sentence, that the trial court entered "nunc pro tunc" to June 28, 2018, constitutes a "new" judgment and thus restarts Petitioner's one-

---

[4] The judge signed the order on June 25, 2021; the order was filed with the clerk on June 30, 2021; and a copy of the order was mailed to Petitioner on July 1, 2021. Doc. 10-17 at 20, 29. Under Florida law, "[a]n order is rendered when a signed, written order is filed with the clerk of the lower tribunal." Fla. R. App. P. 9.020(h).

year limitations period under § 2244. In <u>Osbourne v. Sec'y, Fla. Dep't of Corr.</u>, 968 F.3d 1261 (11th Cir. 2020), the Eleventh Circuit held that the trial court's 2014 "amended sentence," which deleted a ten-year mandatory minimum on one count, "was not a 'new judgment' for purposes of 28 U.S.C. § 2244(b)" because the state court imposed the "amended sentence" <u>nunc</u> <u>pro</u> <u>tunc</u> to the date of the original 2003 judgment, and thus the district court lacked jurisdiction over the petitioner's unauthorized second or successive habeas petition. <u>Id.</u> at 1263, 1266-67. The Court emphasized that "not every action that alters a sentence necessarily constitutes a new judgment" and recognized that it previously "rejected the argument that the test for whether there is a new judgment for purposes of § 2244 should be whether the prisoner's sentence 'has materially changed.'" <u>Id.</u> at 1265, 1266 (summarizing <u>Patterson v. Sec'y, Fla. Dep't of Corr.</u>, 849 F.3d 1321, 1325-28 (11th Cir. 2017)). <u>Cf.</u> <u>Thompson v. Fla. Dep't of Corr.</u>, 606 F. App'x 495, 505 (11th Cir. 2015)[5] (summarizing the court's relevant precedents and holding the petitioner's resentencing resulted in a new judgment where the trial court held "a de novo resentencing hearing [and]

---

[5] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. <u>See</u> <u>McNamara v. GEICO</u>, 30 F.4th 1055, 1060-61 (11th Cir. 2022); <u>see generally</u> Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.")

expressly vacated" his original sentences[6]). Instead, the Court found the "determining factor" was the <u>nunc pro tunc</u> designation, which, under Florida law "means 'now for then' and when a legal order or judgment is imposed <u>nunc pro tunc</u> it refers, not to a new or de novo decision, but to the judicial act previously taken." <u>Osbourne</u>, 968 F.3d at 1266 (internal quotation marks omitted) (distinguishing <u>Magwood v. Patterson</u>, 561 U.S. 320 (2010); <u>Insignares v. Sec'y, Fla. Dep't of Corr.</u>, 755 F.3d 1273 (11th Cir. 2014)); <u>see Cassidy v. Sec'y, Fla. Dep't of Corr.</u>, 119 F.4th 1336, 1340 (11th Cir. 2024) (recognizing that under <u>Osbourne</u>, "an amended sentence that a state court issued <u>nunc pro tunc</u> d[oes] not constitute a new judgment because it relate[s] back to the date of the original judgment" and "[w]hen a state court issues an amended judgment or sentence <u>nunc pro tunc</u>, [Eleventh Circuit] precedent requires [the court] to accept that designation and refrain from evaluating whether it was proper under state law"), <u>cert. pending</u>, No. 24-7200 (May 14, 2025).

In light of this Eleventh Circuit precedent, the Court is required to find that Petitioner's February 6, 2020 judgment, issued <u>nunc pro tunc</u> to June 28, 2018, did not restart the federal one-year limitations period.[7] Therefore,

---

[6] The <u>Thompson</u> decision does not discuss the implication of a "nunc pro tunc" designation.

[7] Regardless, even if the Court found that the February 6, 2020 judgment restarted the one-year limitations period, the Court would still find the Petition timely with equitable and statutory tolling as explained herein.

Petitioner's convictions and sentences became final on January 30, 2020, thirty days after entry of the First DCA's written opinion on direct appeal, which is the timeframe Petitioner had to seek discretionary review in the Florida Supreme Court. See Gonzalez v. Thaler, 565 U.S. 134, 137 (2012) ("We hold that, for a state prisoner who does not seek review in a State's highest court, the judgment becomes 'final' on the date that the time for seeking such review expires."); see also Florida Star v. B.J.F., 530 So. 2d 286 (Fla. 1988) (holding that the Florida Supreme Court has subject-matter jurisdiction to review any decision of a district court of appeal that expressly addresses a question of law within the four corners of the opinion, even if the Florida Supreme Court ultimately denies a petition for discretionary review).

Petitioner's one-year limitations period began to run the next day (January 31, 2020) and it continued to run for 110 days until Petitioner filed his Rule 3.800(a) motion on May 20, 2020. The trial court denied that motion on June 4, 2020. Although Petitioner did not file an appeal, his one-year limitations period remained tolled until the expiration of the 30 days thereafter in which he could have sought an appeal. See Fla. R. Crim. P. 3.800(a)(4) (recognizing that a petitioner may appeal an order denying or dismissing a Rule 3.800(a) motion within 30 days); see also Cramer v. Sec'y, Dep't of Corr., 461 F.3d 1380, 1383-84 (11th Cir. 2006) (finding that a postconviction claim "remains pending until the time to seek review expires," regardless of whether

the petitioner files a notice of appeal). Therefore, his one-year limitations clock resumed on July 7, 2020.[8] Three hundred seventeen days later (May 20, 2021), Petitioner filed his Rule 3.850 motion.[9] This period of time (317 days), combined with the 110 days that already elapsed, was well over one year, meaning that Petitioner's one-year limitations period expired prior to him filing his Rule 3.850 motion. And because there was no time left to toll, the Rule 3.850 motion had no effect on his one-year limitations period. See Sibley v. Culliver, 377 F.3d 1196, 1204 (11th Cir. 2004) (recognizing that "once a deadline has expired, there is nothing left to toll").

Petitioner acknowledges that his Petition is untimely, but he argues that he is entitled to equitable tolling from February 6, 2020, until he filed his Rule 3.850 motion on May 20, 2021, because the trial court failed to timely send him a copy of its January 29, 2020 order on remand denying his motion for a new trial. See Doc. 1 at 16-17; Doc. 13 at 5-6. He also alleges that between January 1, 2020 and October 2020, "the Covid 19 pandemic raged," which "adversely [a]ffected the court system" and "access to the court under the Florida Department of Corrections['] understandable movement limitations concerning

---

[8] The 30th day was Saturday, July 4, 2020, so Petitioner's time to file a notice of appeal was extended to Monday, July 6, 2020. The one-year limitations period began to run the next day.

[9] Respondents appear to assert that only 256 days passed between July 6, 2020 and May 20, 2021, but that calculation is incorrect. Doc. 10 at 7.

its inmate population that influenced [his] ability to obtain timely information about his pending litigation." Doc. 13 at 6. He further states that "[g]enerally speaking, from January 1st, 2020 through July 6, 2020, [Petitioner's] 'meaningful access to the courts' was indeed disrupted, certainly diminished." Id.

"The United States Supreme Court has held that AEDPA's statutory limitations period may be tolled for equitable reasons." Thomas v. Att'y Gen., 992 F.3d 1162, 1179 (11th Cir. 2021). However, "equitable tolling is an extraordinary remedy 'limited to rare and exceptional circumstances and typically applied sparingly.'" Cadet v. Fla. Dep't of Corr., 853 F.3d 1216, 1221 (11th Cir. 2017) (quoting Hunter v. Ferrell, 587 F.3d 1304, 1308 (11th Cir. 2009)). To warrant the application of this extreme remedy, a petitioner must show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." Holland v. Fla., 560 U.S. 631, 649 (2010) (quoting Pace, 544 U.S. at 418). "The petitioner has the burden of establishing his entitlement to equitable tolling; his supporting allegations must be specific and not conclusory." Cole v. Warden, Ga. State Prison, 768 F.3d 1150, 1158 (11th Cir. 2014) (citation omitted); see Brown v. Barrow, 512 F.3d 1304, 1307 (11th Cir. 2008) ("[A]n inmate bears a strong burden to show specific facts to support his claim of extraordinary circumstances and due diligence." (citation omitted)).

Initially, the Court finds that with respect to Petitioner's assertions that the Covid-19 pandemic negatively affected his ability to access the courts, he fails to support that conclusory statement with any facts. Thus, he fails to carry his burden of showing that the pandemic adversely affected his ability to timely file this case.

But his other arguments are well taken. Neither the trial court's January 29, 2020 order on remand nor the February 6, 2020 written judgment and sentence contain a certificate of service, and the trial court's public docket does not reflect that a copy of either document was mailed to Petitioner. It is clear from Petitioner's state court filings that he was under the impression the trial court did not issue a ruling on remand or send him a copy of said ruling.

The trial court's docket reflects that Petitioner filed a request for documents on May 13, 2020 (mailbox rule), seeking a copy of his judgment of conviction and sentence for purposes of preparing an application for clemency.[10] Shortly thereafter, on June 4, 2020, the trial court denied his Rule 3.800(a) motion, and in doing so, it relied on and attached as an exhibit Petitioner's original June 28, 2018 judgment. See Doc. 10-14 at 40-47.

---

[10] Petitioner's request for documents is not included in the record. The Court takes judicial notice of the document from the state court's docket. See, e.g., Paez v. Sec'y, Fla. Dep't of Corr., 947 F.3d 649, 651 (11th Cir. 2020) (per curiam) (finding the district court properly took judicial notice of the petitioner's state court dockets). For ease of reference, the Court attaches a copy of the document to this Order.

Approximately three months later, Petitioner filed his two notices of inquiry. But "the Clerk's response failed to provide the information sought." Doc. 1 at 17. When Petitioner filed his Rule 3.850 motion on May 20, 2021, he argued that the trial court "did not rule on and/or provide certified copies of" its order on remand. Doc. 10-17 at 14. He further acknowledged, however, that the trial court "did send a 'new' judgment and sentence when inquired upon," but "mistakenly forwarded a copy of 'A' denial of a different 'motion for clarification' which has nothing to do with the matter." Id. at 15. The First DCA issued its mandate on appeal from Petitioner's Rule 3.850 proceeding on April 26, 2022. Doc. 10-21 at 4. Four months later, Petitioner filed this case.

As noted, Petitioner acknowledges that at some point, possibly in response to his May 18, 2020 request for documents, he did receive a copy of the "NEW" judgment and sentence. But the trial court, in its June 2020 order denying his Rule 3.800(a) motion added to the apparent confusion by relying on the original judgment.

The Court finds that the trial court's failure to timely send Petitioner a copy of the order on remand and new judgment were circumstances beyond his control, and Petitioner acted with due diligence in pursuing his rights by making efforts to learn the status of the trial court's actions following the First DCA's remand. Based on the record before the Court, it appears the trial court did not explicitly advise Petitioner that it denied his motion for a new trial on

remand until it denied his Rule 3.850 motion. Thus, given the specific facts of this case, the Court finds Petitioner is entitled to equitable tolling from February 6, 2020, the date on which the judge signed the "NEW" judgment, until May 20, 2021, the date on which he filed his Rule 3.850 motion. With equitable and statutory tolling, his Petition is timely filed. As such, the Court addresses the merits of Petitioner's claims.

### III. Merits Discussion

#### a. Governing Legal Authority

##### i. Standard Under AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. See Marshall v. Sec'y Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter,

562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011)

(internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

## ii. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003), and Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. Strickland, 466 U.S. at 687.

There is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

Further, "[t]he question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 562 U.S. at 105. As such, "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" Daniel v. Comm'r, Ala. Dep't of Corr., 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting Strickland, 466 U.S. at 689). "When this presumption is

combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." Id. (citing Richter, 562 U.S. at 105); see also Evans v. Sec'y, Dep't of Corr., 703 F.3d 1316, 1333-35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004).

### b. Trial Testimony

On direct appeal, Petitioner, through counsel, summarized the evidence and testimony submitted at trial as follows:

> Ms. Ethel Anderson lived by herself in her home at 1268 Kennard Street, Jacksonville, in Duval County. In May of 2016, Ms. Anderson kept a bank envelope in a plastic produce bag. The envelope contained nearly $9000. The bag, envelope and money were kept in Ms. Anderson's bathroom between folded towels in a laundry hamper.

> On May 11th, 2016, Ms. Anderson was visited at her home by Kristina Bowden. Ms. Anderson knew Ms. Bowden because she had formerly dated Ms. Anderson's cousin. Ms. Bowden stayed for about an hour. She behaved erratically while she visited Ms. Anderson, moving around the home from the living room to the kitchen. After the visit, Ms. Anderson checked the towels in the bathroom and found the produce bag undisturbed; however[,] Ms. Anderson's hydrocodone pills she kept in the kitchen were missing.

> In the early morning hours of May 12th, 2016, Ms. Anderson was in bed asleep. She was awakened by two men, one black and one white. The black man was armed with a shotgun. The white man repeatedly asked where the money and where the safe were. Although their faces were visible, Ms. Anderson did not recognize either man. The two men began to search through Ms. Anderson's house while she

remained in bed. She believed she heard them counting money. Eventually she heard them leaving the home.

After the two men left, Ms. Anderson went to the neighbor's house. She noticed her car, a 1997 Buick, was missing from her driveway. She kept the keys to her car in her pocket book which was in the living room of her home. Her pocket book with the keys was missing also.[]

When the police arrived, Ms. Anderson returned to her home. She found a number of items missing, including a television, a computer and her clothes hamper.

Ms. Anderson later realized the money she had in the envelope in the produce bag was missing when she saw towels strewn all over her bathroom floor. The empty produce bag was found on the floor in the hallway by Ms. Anderson. It was not seen by the crime scene technician as she photographed the home.

Detective James Hop[el]y of the Jacksonville Police Department (J.S.O.) collected the produce bag and a bank envelope as evidence when he arrived on scene at 5:00 p.m. the same day. It was given to him by a male friend of Ms. Anderson while the Detective was at Ms. Anderson's home. Det. Hop[el]y requested the bank envelope and exterior of the produce bag be processed for latent prints by the J.S.O.'s fingerprint lab. While there were no fingerprints recovered from the bank envelope, there were two latent prints recovered from the produce bag. A latent palm print and a latent finger print recovered from the produce bag matched prints taken from Derek Clayton Smith.

A hat the white male was wearing and left behind was also collected as evidence from the foot of Ms. Anderson's bed. The hat was swabbed for DNA, along with the front door knob and the bedroom dresser handles. The DNA samples from the hat, the door knob and the dresser handles were tested by the Florida Department of Law Enforcement. The results were not interpretable.

Prior to the burglary, Ms. Anderson did not know anyone by the name of Derek Clayton Smith. She was not able to identify a photograph of Mr. Smith administered by Det. Hopely.

Det. Hopely showed Ms. Anderson a photo of Ms. Bowden, which she [was] able to identify by name as the woman who visited her home the day before the burglary.

SG Motors was a car dealership in Jacksonville, owned by Shuwan Goodman. Ms. Goodman's sales person was her fiancé, Torrence McGauley. On May 14th, 2016, a woman came to SG Motors, executed a contract and paid $2700 cash for a 2005 Pontiac Bonneville, using the name Kristina Bowden. Ms. Goodman later identified a photograph of Ms. Bowden during a photospread by Det. Hopely.

A man accompanied Ms. Bowden to SG Motors on the 14th. He remained outside in the lot with Mr. McGauley while Ms. Bowden transacted the purchase of the Bonneville inside the dealership. Mr. McGauley took a picture of the man standing next to the Bonneville to post on Facebook that date. Mr. McGauley later identified a photograph of Derek Clayton Smith as the man with Ms. Bowden on May 14th in a photospread conducted by Det. Hopely.

Mrs. Anderson's 1997 Buick was eventually found on August 12th, 2016, behind an abandon[ed] residence in Jacksonville. The car had been stripped of tires, some engine components and a door.[] Mr. Smith's fingerprints and DNA were not found on Ms. Anderson's Buick.

Doc. 10-5 at 10-14 (internal record citations and footnotes omitted).

### c. **Merits Analysis**

#### i. **Ground One**

Petitioner argues that his trial counsel was ineffective when he "failed to cross-examine state witness via defense of impeachment, inconsistent

statements" and by failing "to object and suppress evidence"—the plastic bag with his fingerprint—"by establishing a break in the chain of custody which tainted [the] state's only material evidence." Doc. 1 at 7. He explains that during the trial, Detective Hopely testified that the victim's "male friend[,] who was accompanying the female" at the victim's home, "got up and walked out of his sight and returned moments later with the items in his possession." Id. According to Petitioner, "[t]his assertion contradicts the initial redacted police report submitted by Detective Hopely where he stated that he collected the items from the floor." Id. Despite Petitioner making counsel aware of the inconsistency, "[c]ounsel failed to act promptly and impeach" Detective Hopely. Id. Petitioner argues that if this evidence would have been excluded, the outcome of his trial would have been different. Id. at 8.

Petitioner also challenges counsel's failure "to object and suppress the state's evidence of the plastic bag containing his fingerprint" during the trial. Id. He contends that he made his "[c]ounsel aware of the significant discrepancies in the witness['] testimony, the gap in the chain of custody indicating the possibility of tampering and tainting of the only physical evidence," but his counsel failed to object or move to suppress the evidence. Id.

Petitioner raised similar allegations in his Rule 3.850 motion. He argued that his counsel failed to impeach the witness on his inconsistent statements and the inconsistency substantiated subsequent suppression of the evidence

which was necessary for his conviction. Doc. 10-17 at 10. He asserted that his

counsel's failure to impeach the witness "and/or suppress evidence falls far

below the parameters of expected and sufficient performance by counsel." Id. at

11.

The postconviction court summarily denied the claim as follows:

> In Ground One of his motion, the Defendant alleges
> Defense Counsel failed to impeach the testimony of
> Anderson and Detective Hopely. The claim is refuted by the
> record.
>
> The trial record shows that Defense Counsel did what
> Defendant now alleges he failed to do. During cross-
> examination, Defense Counsel attacked numerous aspects of
> Anderson's testimony. He used the State's crime scene
> photographs to question Anderson's account of exactly where
> she discovered the empty plastic bag. He attempted to
> demonstrate inconsistencies about the amount of money
> that Anderson said she kept in the plastic bag. He cited
> Anderson's deposition to suggest that she provided
> contradictory accounts of who knew that she stored cash at
> her home. When cross-examining Detective Hopely, Defense
> Counsel inquired about items of evidence that were not
> reflected in crime scene photographs and reports.
>
> Furthermore, the Defendant alleges that he asked
> Defense Counsel to inquire about various inconsistencies in
> the witnesses' testimonies, but that Defense Counsel failed
> to do so. However, at the conclusion of Defense Counsel's
> cross-examination of Anderson, the trial court directed
> Defense Counsel to confer with the Defendant to confirm
> there were no additional questions that Defense Counsel
> needed to ask. After doing so, Defense Counsel confirmed he
> had no additional questions for the witness. Defense Counsel
> likewise conferred with the Defendant after cross-examining
> Detective Hopely. During his colloquy with the trial court,
> the Defendant swore he was satisfied with Defense Counsel's

cross-examinations. The Defendant's sworn colloquy contained the following exchange:

> **THE COURT: Okay. Next, I'm going to talk to you about the defense that has been presented on your behalf. Are you satisfied with the defense that your attorney has put forth on your behalf?**
>
> **THE DEFENDANT: Yes, ma'am.**
>
> THE COURT: Has he called all the witnesses -- has he done the investigation as you have asked him to do?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: He has indicated that there are no witnesses for the defense. Is that your understanding?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: Is that your agreement?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: Are there any witnesses that you want him to call that he has not called?
>
> THE DEFENDANT: No, ma'am.
>
> **THE COURT: Has he cross-examined all of the State's witnesses as you have asked him to do?**
>
> **THE DEFENDANT: Yes, ma'am.**
>
> THE COURT: Have you had enough time to speak with him about all of the matters as it relates to your case and your jury trial?

22

THE DEFENDANT: Yes, ma'am.

THE COURT: Has he answered your questions to your complete satisfaction and understanding?

THE DEFENDANT: Yes, ma'am.

THE COURT: Have you told him everything you want him to know about your case?

THE DEFENDANT: Yes, ma'am.

THE COURT: Do you need any more time to have any discussions before we proceed to closing arguments and jury instructions.

THE DEFENDANT: No, ma'am.

**THE COURT: Are you completely satisfied with his representation?**

**THE DEFENDANT: Yes, ma'am.**

The Defendant alleges he asked Defense Counsel to pose additional questions during cross-examination. However, the portions of the record cited above - including the Defendant's attestation that Defense Counsel's cross-examination of the State's witnesses comported with the Defendant's desires - conclusively refute this allegation. As such, the Defendant is not entitled to relief. See Kelley v. State, 109 So. 3d 811, 812-13 (Fla. 1st DCA 2013) ("A rule 3.850 motion cannot be used to go behind representations the defendant made to the trial court, and the court may summarily deny post-conviction claims that are refuted by such representations."); Henry v. State, 920 So. 2d 1245, 1246 (Fla. 5th DCA 2006) ("Defendants are bound by the statements made by them under oath . . . ."); Manning v. State, 305 So. 3d 355, 356-57 (Fla. 1st DCA 2020) ("Manning's second claim, that her counsel was ineffective for not moving for a change of venue, is also refuted by the

record. When Manning entered her plea, she knew that her counsel had not moved for a change of venue. Yet she swore under oath that she was satisfied with her counsel's services. This attestation prevents her from complaining now of her counsel's performance.").

Finally, the full body of evidence the State presented against the Defendant - including the presence of his fingerprints on the plastic bag from the crime scene - shows there is no reasonable probability that Defense Counsel could have altered the trial's outcome by asking additional questions during cross-examination of the State's witnesses. Accordingly, the Defendant cannot demonstrate the prejudice that <u>Strickland</u> demands. For the reasons set forth above, the Court summarily denies Ground One of the Defendant's motion.

Doc. 10-17 at 24-27 (emphasis added; internal record citations omitted). Petitioner appealed the postconviction court's denial of this claim (<u>see</u> Doc. 10-19), and the First DCA per curiam affirmed the postconviction court's decision without issuing a written opinion. <u>See</u> Doc. 10-21.

This Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications and finds that the record supports the state court's decision. Thus, upon thorough review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the

evidence presented. Therefore, Petitioner is not entitled to federal habeas relief on Ground One.

Even assuming the state court's decision is not entitled to deference, the claim has no merit. Petitioner's instant claim cannot be reconciled with his sworn statements to the trial court that he was satisfied with his counsel's representation, including counsel's cross-examination of the state's witnesses. Cf. Blackledge v. Allison, 431 U.S. 63, 74 (1977) (recognizing that a defendant's statements at a plea hearing "constitute a formidable barrier in any subsequent collateral proceedings" because "[s]olemn declarations in open court carry a strong presumption of verity").

Moreover, there is a strong presumption in favor of competence when evaluating the performance prong of the Strickland ineffectiveness inquiry. See Anderson v. Sec'y, Fla. Dep't of Corr., 752 F.3d 881, 904 (11th Cir. 2014). The inquiry is "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. "[H]indsight is discounted by pegging adequacy to 'counsel's perspective at the time' . . . and by giving a 'heavy measure of deference to counsel's judgments.'" Rompilla v. Beard, 545 U.S. 374, 381 (2005). Thus, Petitioner must establish that no competent attorney would have taken the action that his counsel chose.

Notably, the test for ineffectiveness is neither whether counsel could have done more nor whether the best criminal defense attorneys might have done more; in retrospect, one may always identify shortcomings. Waters v. Thomas, 46 F.3d 1506, 1514 (11th Cir. 1995) ("[P]erfection is not the standard of effective assistance."). Instead, the test is whether counsel's actions were within the wide range of reasonable professional assistance. Ward, 592 F.3d at 1164; Dingle v. Sec'y for Dep't of Corr., 480 F.3d 1092, 1099 (11th Cir. 2007) ("The question is whether some reasonable lawyer at the trial could have acted as defense counsel acted in the trial at issue and not what most good lawyers would have done." (internal quotation marks and citation omitted)).

It cannot be said that no reasonable lawyer would have acted in the manner Petitioner's counsel did. And the trial court's colloquy with Petitioner reflects that Petitioner was completely satisfied with his counsel's performance, including the cross-examination of the state's witnesses. Regardless, Petitioner has not shown prejudice. During cross-examination, Detective Hopely testified that the male friend who was accompanying the female relative at the victim's home walked out of his sight and then returned with a plastic bag and a bank envelope. Doc. 10-4 at 170. Then on re-direct, Detective Hopely explained that he directed the individual to drop the items on the floor so Detective Hopely could put on latex gloves and collect the items for evidence. Id. at 175. Even taking Petitioner's assertions in the Petition as true, had counsel attempted to

impeach Detective Hopely on cross-examination with his alleged statement in a police report "where he stated that he collected the items from the floor," the detective likely would have given the same answer as he did on re-direct—that he instructed the individual to place the items on the floor so he could collect them. Thus, there was no inconsistency between Detective Hopely's alleged statement in the police report and his trial testimony regarding from where he collected the evidence.

Likewise, counsel was not deficient for failing to file a motion to suppress during the trial. A typical "chain of custody" issue arises when the chain is broken between the seizure of the evidence and a subsequent trial. See United States v. White, 569 F.2d 263, 266 (5th Cir. 1978). Here, however, Petitioner alleges that the "break" in the "chain of custody" occurred between the time the crime scene investigator left the scene and Detective Hopely's arrival on scene when he collected the subject evidence. Petitioner suggests that because the crime scene was not in the custody of law enforcement between the time the crime scene investigator left and the time Detective Hopely arrived, there was a break in the chain of custody.

"Relevant physical evidence is admissible unless there is an indication of probable tampering." Armstrong v. State, 73 So. 3d 155, 171 (Fla. 2011) (internal quotations and citations omitted). "In order to demonstrate probable tampering, the party attempting to bar the evidence must show that there was

27

a probability that the evidence was tampered with—the mere possibility is insufficient." Id. Florida law is clear that "a broken chain of custody alone is [not] enough by itself to establish probable tampering." Overton v. State, 976 So. 2d 536, 552 (Fla. 2007).

Petitioner's argument does not suggest probable tampering. Petitioner's speculation is insufficient; thus, counsel would not have prevailed on a motion to suppress. Counsel elicited from Detective Hopely on cross-examination that the crime scene investigator did not photograph or take custody of the plastic bag when she went through the home earlier and that the home had not been in the care, custody, or control of law enforcement for a period of time before Detective Hopely arrived. Doc. 10-4 at 169-71. Petitioner's counsel highlighted during closing argument the fact that the bag was not initially discovered at the scene by the crime scene investigator or law enforcement until it was given to Detective Hopely later that day by the victim's relative's friend. See id. at 298-99. Counsel further highlighted that the state failed to prove how the bag got into the victim's home, including addressing how Petitioner's girlfriend was in the home the day before for apparent nefarious reasons. See id. at 300-01, 306-37. Counsel also argued that the state failed to show when Petitioner's fingerprints were placed on that bag. See id. at 304-06. The testimony Petitioner cites to would not have supported a motion to suppress the plastic bag with his fingerprint on it. Instead, counsel used the unknown variables relating to the

28

plastic bag in his closing argument to suggest that Petitioner was not guilty. Upon review, the Court finds that Ground One is due to be denied.

### ii. Ground Two

Petitioner argues that the state court violated his Fifth and Fourteenth Amendment rights "where Petitioner was denied his right to appeal." Doc. 10 at 10 (capitalization and emphasis omitted). According to Petitioner, on January 29, 2020, the trial court issued a ruling on remand denying his motion for a new trial, but the court never sent Petitioner a copy of the order. See id. at 10-12. Petitioner contends that he raised two claims in his Rule 3.850 motion relating to this issue, and he "stressed that under such circumstances he was denied his right to appeal." Id. at 11. He asserts that he requested the First DCA "to treat the brief and arguments . . . as a petition for belated appeal and to render him an opportunity to appeal." Id. at 12.

In Petitioner's Rule 3.850 proceeding, the postconviction court found that (1) Petitioner suffered no prejudice from his counsel's failure to object when the trial court used the wrong standard on his motion for new trial because the First DCA remanded on that issue and the trial court issued a new ruling; and (2) no fundamental error occurred, because the trial court ruled on the motion for new trial on remand as directed by the First DCA. Doc. 10-17 at 28. Petitioner appealed, arguing in terms of state law only that the postconviction court did not have subject matter jurisdiction to rule on his claims because a request for

a belated appeal must be decided by the First DCA. <u>See</u> Doc. 10-19 at 23-24.
The First DCA per curiam affirmed without issuing a written opinion. Doc. 10-
21.

Even though Petitioner attempts to frame this argument—that the First
DCA did not treat his initial brief as a motion for a belated appeal—as an issue
of federal constitutional law, at bottom, it is an issue of state law. The purpose
of a federal habeas proceeding is to review the lawfulness of Petitioner's custody
to determine whether that custody is in violation of the Constitution or laws of
the United States. <u>Coleman v. Thompson</u>, 501 U.S. 722, 730 (1991). "Indeed,
questions of state law rarely raise issues of federal constitutional significance
and, therefore, '[a] state's interpretation of its own laws or rules provides no
basis for federal habeas corpus relief, since no question of a constitutional
nature is involved.'" <u>Sneed v. Fla. Dep't of Corr.</u>, 496 F. App'x 20, 24-25 (11th
Cir. 2012) (quoting <u>Carrizales v. Wainwright</u>, 699 F.2d 1053, 1055 (11th
Cir.1983)). Because Petitioner is challenging the state court's interpretation of
state law, this Court on federal habeas review cannot provide him with relief.

Accordingly, it is

**ORDERED**:

1.    The Petition (Doc. 1) is **DENIED**, and this case is **DISMISSED
WITH PREJUDICE**.

2.     The **Clerk of Court** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

3.     If Petitioner appeals, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[11]

**DONE AND ORDERED** at Jacksonville, Florida, this 27th day of June 2025.



TIMOTHY J. CORRIGAN
Senior United States District Judge

JAX-3 6/20
Attachment: Request for Documents

c (w/ attachment):
Derek C. Smith, #J35411
Counsel of Record

---

[11] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.